920 So.2d 346 (2006)
James ROBINSON, Plaintiff-Appellant
v.
Billy H. TOLBERT, et al., Defendant-Appellee.
No. 40,488-CA.
Court of Appeal of Louisiana, Second Circuit.
January 20, 2006.
*347 Sheva Meshawn Sims, Shreveport, for Appellant, James Robinson.
Tracy L. Oakley, for Appellee, Safeway Insurance Company of Louisiana.
Law Offices of Harold G. Toscano, by Steven Curtis Mitchell, for Appellees, Billy H. Tolbert, Gregory Tolbert, Renea Tolbert and Encompass Insurance Company.
Before WILLIAMS, DREW and LOLLEY, JJ.
DREW, J.
Plaintiff, James Robinson, appeals the judgment in this personal injury case arising out of a motor vehicle accident. Robinson argues that the general damages award of $5,000 is inadequate, and that the trial court erred in denying his claim for penalties and attorney fees from his auto insurance company. We affirm.

FACTS
On May 2, 2002, James Robinson was driving his Dodge pickup truck on Louisiana Highway 1 in Caddo Parish when he stopped his truck to wait for the vehicle in front of him to turn left. Subsequently, a vehicle driven by Gregory Tolbert rear-ended Robinson's truck.
Robinson was transported by ambulance to North Caddo Medical Center in Vivian, *348 Louisiana, and then to Schumpert Hospital in Shreveport. Robinson complained of a headache and pain in his neck, low back, and all along the left side of his body. A C-spine x-ray showed evidence of a prior surgery for injuries from an auto accident, but did not reveal any acute injury or fractures. An L-spine x-ray was negative. The emergency room physician felt that Robinson had more of a strain to his muscles and back, left side, without finding anything specific.
On October 8, 2002, Robinson filed suit against Tolbert; Tolbert's parents; their liability insurer, Encompass Insurance Company; and Robinson's own UM insurer, Safeway Insurance Company. The trial court granted Robinson's motion for summary judgment on the issue of liability, and the parties proceeded to a bench trial on the issue of damages.
The trial court found that Robinson sustained relatively minor injuries and damage in the accident, sustained no long-term aggravation to his preexisting medical condition, and sustained no damage in the accident that survived his discharge from physical therapy on July 10, 2002. Robinson was awarded $5,000 in general damages. The claim for penalties and attorney fees against Safeway was denied. Tolbert's parents had been dismissed as defendants at the close of evidence.
Robinson has appealed the judgment, arguing that the general damages award was inadequate to compensate him for the aggravation of his preexisting injury. Robinson further contends that the trial court erred in not awarding penalties and attorney fees for Safeway Insurance's refusal to timely pay his claim.

DISCUSSION

General Damages Award
The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses, and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper; if an award is abusively low, it is raised to the lowest amount the trier of fact could reasonably have awarded. Dixon v. Tillman, 29,483 (La.App. 2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for determining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App. 2d Cir.8/19/98), 717 So.2d 277.
A defendant in a personal injury case takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. When the tortfeasor's conduct aggravates a preexisting condition, the tortfeasor must compensate the victim for the full extent of the aggravation. Lenard v. State Farm Mut. Auto. Ins. Co., 39,580 (La.App. 2d Cir.4/20/05), 900 So.2d 322, citing Foreman *349 v. Babin, 04-423 (La.App. 5th Cir.10/12/04), 887 So.2d 143.
Robinson contends in his first assignment of error that the trial court awarded only $5,000 in general damages despite evidence establishing the aggravation of Robinson's preexisting injury. Accordingly, our discussion begins with an examination of Robinson's medical history prior to the May 2002 accident. Most of these preexisting injuries were apparently caused by Robinson's involvement in a motor vehicle accident on September 19, 1998.
Robinson presented at the Schumpert Emergency Room on February 13, 1999, with complaints of severe constant left shoulder and neck pain. An x-ray of the cervical spine showed narrowing at the C5-6 and C6-7 levels with hypertrophic change present. The emergency room physician's diagnosis was cervical spine disease as the most likely cause of his pain. Robinson was examined by Dr. David Cavanaugh three days later, and Robinson complained to Dr. Cavanaugh about sharp pain in his neck with cramping that radiated into his left arm and hand, causing tingling and numbness. Shortly thereafter, Robinson was referred to a chiropractor, Michael Taylor, who treated Robinson for approximately five months.
Robinson was examined by Dr. Baer Rambach, an orthopaedic surgeon, on March 25, 1999. Robinson stated that he was suffering from pain, soreness, and stiffness in his neck and lower back, and weakness in his left upper extremity. Dr. Rambach's impression was that Robinson had sustained significant soft tissue injuries to the cervical and lumbosacral regions of his spine. Dr. Rambach believed that there were myoligamentous and myofascial sprains to the cervical and lumbar areas in the lumbosacral areas of the spine, although he thought the lumbosacral spine area was improving. Five days later, Robinson was examined by Dr. Edward Dean, a partner of Dr. Rambach, for a second opinion for a workers' compensation insurer. Dr. Dean's impression was acute cervical sprain with probable lumbar strain.
Dr. Rambach ordered an MRI of Robinson's cervical spine that was performed on March 31, 1999. The MRI showed severe degenerative disc disease extending from C3-4 through C6-7 that consisted of four consecutive mixed ventral disc protrusions. When Robinson next met with Dr. Rambach on April 26, 1999, Robinson stated that he had pain in his left shoulder and neck. Robinson complained about neck pain, left shoulder and arm discomfort, weakness in his left arm, and dorsal spine pain mostly on the left side when he was treated by Dr. Rambach on May 13, 1999. Dr. Rambach treated Robinson for the last time on June 28, 1999. Dr. Rambach, who noted that he did not think Robinson's lower back problems were of the magnitude of his cervical problems, referred Robinson to one of his partners, Dr. James Zum Brunnen.
Dr. Zum Brunnen first examined Robinson on July 20, 1999. Noting that an earlier cervical MRI showed a herniated cervical disc at C6-C7 on the left, Dr. Zum Brunnen recommended a cervical diskectomy and fusion at C6-7, as well as the installation of a plate. On August 27, 1999, Robinson was seen by Dr. Carl Goodman for an independent medical examination. Upon viewing the MRI films, Dr. Goodman felt that Robinson had significant C6-7 disc herniation on the left with degenerative changes at C5-6, and he agreed with the surgery recommendation of Dr. Zum Brunnen.
On September 23, 1999, Dr. Zum Brunnen performed an anterior cervical diskectomy and spinal canal decompression at C6-7, an anterior cervical diskectomy at *350 C5-6, anterior cervical interbody arthrodesis at C5-6 and C6-7, and an anterior cervical plating at C5-6 and C6-7. Dr. Zum Brunnen's diagnosis was a herniated cervical disk at C6-7 left, and cervical spondylosis and instability at C5-6 and C6-7.
Robinson began physical therapy with Larry Larsen on November 3, 1999, upon a referral from Dr. Zum Brunnen. He was treated by Larsen on 59 occasions through April 7, 2000. During some of these visits, Robinson complained to Larsen about neck pain and tightness, and severe headaches.
Robinson was next examined by Dr. Zum Brunnen on December 1, 1999, when Robinson reported pain in his neck as well as in his shoulders and the back of his head. Dr. Zum Brunnen recommended continued therapy with Larsen. When Dr. Zum Brunnen treated Robinson on January 19, 2000, Robinson complained of cervical spine pain, severe headaches, and blackouts. Dr. Zum Brunnen referred Robinson to Dr. Krzysztof Kundo, a neurologist, for treatment of the headaches. Dr. Kundo's assessment was post-traumatic migraine and neck pain radiating to the head that evolved into headaches.
When Robinson completed his series of therapy with Larsen in April of 2000, it was noted that Robinson's headaches were 25% of what they were at their worst. Larsen wrote in his April 10, 2000, report that Robinson felt he had plateaued, and Larsen felt Robinson could be discharged from physical therapy. However, Larsen also noted that Robinson was still having neck problems, headaches, and slight weakness in the left upper extremity.
Dr. Zum Brunnen next examined Robinson on May 19, 2000. Robinson complained of severe pain, headaches, and left arm pain, and he felt that he was getting worse. Robinson complained of increased neck pain and left arm swelling when Dr. Zum Brunnen met with him on May 24, 2000.
A May 31, 2000, cervical spine MRI ordered by Dr. Zum Brunnen showed bulging with slight narrowing of the neural foramina on the right at C3-4. On June 7, 2000, Robinson complained to Dr. Zum Brunnen about his headaches. Dr. Zum Brunnen referred Robinson back to Larsen.
Robinson received physical therapy from Larsen approximately 51 times between June 16 and November 30, 2000. During this period, Robinson told Larsen about pain and stiffness in his neck and headaches, some of which were severe. Robinson also reported that he experienced light, motion, and sound sensitivity as a result of his headaches.
Robinson mentioned having bad headaches to Dr. Zum Brunnen on July 19, 2000, and again on August 25, 2000. Robinson met with Dr. Kundo for a follow-up visit on October 3, 2000. Robinson told Dr. Kundo that his headaches were worse, and that he had left arm numbness. Robinson also told Dr. Kundo that his headaches had worsened after his surgery.
On November 15, 2000, Robinson complained to Dr. Zum Brunnen about neck pain and headaches. Dr. Zum Brunnen wanted Robinson to continue physical therapy with Larsen. Robinson told Dr. Zum Brunnen on January 10, 2001, that his physical therapy had stopped because the insurer had only approved two weeks of physical therapy. Dr. Zum Brunnen prescribed additional physical therapy. Dr. Zum Brunnen examined Robinson on March 7, 2001, and noted that Robinson's headaches and neck pain continued, and that Robinson was not receiving physical therapy because it had not been arranged.
*351 Robinson began his next series of physical therapy with Larsen on March 13, 2001, and it took place over approximately 27 visits through May 18, 2001. In his March 13 evaluation, Larsen noted that Robinson had deteriorated since he was last seen by Larsen, and that Robinson had pain radiating down the arms and he became dizzy when his head was tilted to the side. During this series of therapy sessions, Robinson reported experiencing headaches, some of which were severe, and neck tightness. He also had sensitivity to light and sound caused by the headaches.
Robinson told Dr. Zum Brunnen on March 28, 2001, that physical therapy had helped a lot, but he still complained of severe headaches, left arm pain, and neck pain. Dr. Zum Brunnen was told by Robinson on April 13, 2001, that he was benefiting greatly from physical therapy. When Robinson was examined by Dr. Zum Brunnen on May 25, 2001, Robinson stated that physical therapy was helping him a lot, but he still reported having severe headaches. Cervical x-rays showed further degenerative change since October 1999 in the C3-4 area, and Dr. Zum Brunnen thought that Robinson could be having symptoms from the C3-4 disc or the C4-5 disc. Dr. Zum Brunnen ordered a cervical MRI.
Larsen evaluated Robinson on May 30, 2001, and noted that Robinson's condition appeared to have worsened since his last visit. Although Robinson's chief complaints continued to be a stiff neck and headaches, he also had radiating arm pain, including increased pain down the right arm.
The MRI ordered by Dr. Zum Brunnen was performed on June 15, 2001, and it showed mild/moderate degenerative disc changes at C3-4 and C4-5 with ventral bony ridging, slightly greater on the right than left at both levels without significant appearing narrowing of the spinal canal or effacement of the thecal sac. The MRI also showed right C4-5 uncovertebral spurring with mild right C4-5 nerve root canal narrowing. When Dr. Zum Brunnen examined the MRI film on June 29, 2001, he noted that the degenerative changes had been present all along. Because Robinson continued to experience pain, including headaches, Dr. Zum Brunnen referred Robinson to pain management. Robinson next visited with Dr. Zum Brunnen on August 29, 2001. Robinson complained that his headaches had worsened as he had been unable to attend physical therapy because of lack of approval from the workers' compensation insurer. Robinson also reported pain upon extension and flexion of the lumbar spine.
Robinson was treated by Dr. Kathleen Majors, a pain care consultant, on October 8, 2001. His chief complaints were neck and upper extremity pain, with Robinson describing his pain as being 70% related to the neck and 30% related to the left shoulder and left upper extremity. The complaints of neck and upper extremity pain continued during subsequent visits with Dr. Majors, who suggested cervical epidural steroid injections.
The next series of physical therapy by Larsen occurred over approximately 20 visits between October 18 and November 27, 2001. During this period, Robinson primarily complained to Larsen about his headaches, some of which were severe. On October 29 and November 9, Robinson reported having a severe headache that he said was an eight on a ten-point scale. Larsen tried a new form of therapy, sympathetic electrical stimulation, during these sessions. On November 27, 2001, it was noted that Robinson felt that he was 35% better in both pain and frequency of pain after the 20 stimulation sessions. Larsen testified that during this period *352 they were not focusing on the neck pain, but instead were focusing on the headaches.
Dr. Zum Brunnen examined Robinson on February 27, 2002. Robinson stated that he had left arm pain and worsening pain on the left side of his neck, and he felt he was losing feeling in his left leg. Dr. Zum Brunnen found that Robinson had a moderate restriction of range of motion in his cervical spine, as well as pain with straight leg raising on the left.
Robinson was treated by Larsen just days prior to the accident on a referral from Dr. Majors. Progress notes from an April 29, 2002, visit state that Robinson complained about "8/10 pain in the cervical area, upper shoulders, and all the way down his left side." His ranges of motion were limited by 30% in all ranges. Although the notes from that visit do not mention headaches, Larsen testified that he would be surprised if Robinson was not having them at the time. Larsen also stated that he did not feel that Robinson was quite as bad as he was on March 13, 2000.[1] Larsen next saw Robinson on May 1. The condition of Robinson's neck and upper back was about the same and he was having a lot of tightness.
Robinson was involved in the motor vehicle accident with Tolbert on May 2, 2002. Upon learning the next day about the accident, Larsen terminated the physical therapy pending a reevaluation by Robinson's doctor.
On May 16, 2002, Robinson was examined by Dr. Mairus McFarland, a family practice physician. Robinson complained of persistent headaches since the accident and pain in his lower and upper back and entire left side of his body, and atypical chest pain from the mid-chest region up. Robinson also reported having had pain despite routinely taking Soma and Vioxx. Dr. McFarland recorded a decreased range of motion in the neck secondary to paraspinous muscle pain and tenderness, and, in Robinson's back, multiple complaints of pain to palpation of the shoulder muscles and paraspinous muscles in the thoracic region. Robinson did not report blurred vision, spots in front of his eyes, or visual changes. Dr. McFarland's assessment was cervical disc disease, cervical strain, and musculoskeletal pain. His recommendation was to continue with Soma and Vioxx and consider physical therapy.
Dr. McFarland testified that Robinson mentioned his preexisting cervical injury, but did not make him aware that the headaches preexisted the 2002 accident. Dr. McFarland's impression at the first examination was that the headaches were a new condition. Robinson did tell Dr. McFarland at the first visit that the pain had increased in his neck, lower back, upper back, and entire left body since the 2002 accident.
Robinson saw Dr. Zum Brunnen for the first time after the accident at issue on May 22, 2002. Robinson stated that his neck still bothered him. It was recorded that Robinson had a moderate restriction of range of motion in the cervical spine.
Dr. McFarland examined Robinson next on June 7, 2002. Robinson continued to have persistent back pain, headaches, and neck pain, as well as musculoskeletal complaints. One thing that Dr. McFarland found different from the first visit was that Robinson had a decreased range of motion *353 in his extremities secondary to pain and stiffness.
On a referral from Dr. McFarland, Robinson was treated by Larsen on 12 occasions between June 10 and July 10, 2002. Robinson told Larsen on June 10 that his headaches were ten on a ten-point scale and occurred one to two times a day. Robinson denied experiencing blurred vision or dizziness, but he did say his head was numb where he hit it on the back window of his truck. Robinson also reported having pain down both arms. Larsen found that Robinson had about a 50% decrease in all ranges of motion in the cervical and upper thoracic regions with sharp pain at the end of range of motion. Range of motion was within normal limits in the lumbosacral region but was very painful at the end of all ranges. Larsen testified that at that time, Robinson's cervical area condition was similar to before the accident, but was more acute. Larsen explained that what he meant by acute was that the cervical tightness went all the way into the thoracic region, his range of motion had been decreased to 50% as opposed to the prior 25%, and he had sharp pain at the end of the range of motion. In addition, Robinson now complained of lower back sprain and pain.
During these physical therapy sessions, Robinson regularly complained about photo and noise sensitivity, tightness in his neck and back, and headaches which were sometimes severe. On July 8, it was noted by Larsen that Robinson's back was doing much better, with no spasm. The notes from Robinson's July 10, 2002, therapy session state that Robinson said he was feeling better than he had in a long time. Larsen's assessment from the July 10 visit reads, "The patient is better than we have seen him in a long time. I would not suggest that this is a permanent condition at this time. Should his pain be gone and stay away for 3 or 4 weeks, I would suggest that he is recovering from his problem." Because Robinson did not return for treatment until nearly six months later, Larsen assumed that he had recovered from the effects of the 2002 auto accident.
Dr. McFarland next saw Robinson on July 10, 2002. Robinson continued to complain to Dr. McFarland about persistent neck and back pain. Robinson also reported that his headaches had worsened over the last several weeks, that he had persistent numbness in the back of the head and neck after hitting the rear windshield, and that he also had musculoskeletal pain. A new finding during this examination was pain upon palpation of the back of his scalp.
Robinson was treated by Dr. McFarland on July 26, 2002. Robinson stated that he had persistent neck and back pain, as well as headaches and pain in the left side of his neck and left leg. When Dr. McFarland treated Robinson on August 2, 2002, Robinson complained about musculoskeletal pain, severe pain in his neck and low back, and persistent headaches.
Dr. McFarland noted on August 16, 2002, that Robinson had made slow improvement except for his chronic headaches which appeared to be getting worse. It was believed by Dr. McFarland that Robinson's headaches were consistent with vascular headaches. However, Dr. McFarland testified in his deposition that had he known that Robinson had chronic headaches along with his neck pain prior to the accident, that would have had an effect on his opinion as to the cause of the headaches and the headaches would have been less bothersome to him.
When Dr. McFarland treated Robinson on October 2, 2002, Robinson reported having chronic headaches and persistent pain in his right side, chest, leg, back and shoulder. Robinson was last treated by *354 Dr. McFarland on November 11, 2002. Robinson's major complaints at that time were right hand and left leg swelling. He also had decreased range of motion in his neck and back.
Robinson was next treated by Larsen on 16 occasions between January 9 and February 14, 2003 on a referral from Dr. Zum Brunnen. The January 9 evaluation states that Robinson was primarily concerned about his headaches, and Robinson told Larsen about having blurred vision, but not dizziness, from the headaches. Robinson also reported having severe neck pain at times. Robinson's focus during this series of physical therapy sessions was on his headaches, some of which were still severe. It was noted on January 28 and January 30 that Robinson was the best Larsen had seen. However, a note on February 28 states that Robinson still had severe headaches with a stiff neck, as well as vision problems and sensitivity to light and sounds. It was also noted at the time that Robinson did not make any progress with the treatment during that series of sessions.
Larsen testified that Robinson was in the same condition in January of 2003 that he was in prior to the 2002 accident. Larsen was focused at the time on Robinson's neck and not his back. Larsen also felt that Robinson's complaints at that time were related to the 1998 car accident. Larsen did an evaluation on March 25, 2003, but because Robinson could not get approval for treatment, he did not see Robinson again until November of 2003 on a referral from Dr. Zum Brunnen. Larsen testified that Robinson's problems in November of 2003 were essentially the same as they had been in March of 2003. Larsen treated Robinson until December 5, 2003. On that date, Robinson said his headaches were not as bad and did not occur as frequently.
When Robinson testified at trial, he described the impact from the accident as severe and a ten on a ten-point scale. Robinson also testified that his headaches after the accident were more severe than prior to the accident, which Robinson attributed to hitting his head on the rear glass of his truck during the collision. Robinson stated that at the time of trial he was still suffering from the injuries he received in the accident at issue, and he still had stiffness, lower back pain, headaches, and sometimes blurry vision caused by the headaches.
Based upon our review of McFarland's voluminous medical records from both before and after the May 2002 accident, as well as the testimony of Robinson, Larsen, and Dr. McFarland, we cannot conclude that the trial court abused its discretion in awarding $5,000 in general damages.

Penalties and Attorney Fees
Robinson argues that the trial court erred in not awarding penalties and attorney fees under La. R.S. 22:658 and 22:1220 for what he asserts was Safeway's arbitrary and capricious failure to timely pay his claim. Robertson argues that his truck was not repaired for approximately five to six months after the accident because Safeway failed to tender payment.
Safeway's policy provided $10,000 in uninsured/underinsured motorist coverage for bodily injury and property damage to Robinson's truck. The truck had neither comprehensive nor collision coverage. The Encompass policy covering Tolbert's vehicle provided $25,000 in liability coverage for bodily injury, and $25,000 in liability coverage for property damage. For payment of property damages, Encompass paid to Robinson $456.05 on July 21, 2003, and $276.58 on November 18, 2003.
Safeway was not arbitrary and capricious in failing to submit payment for *355 property damages under its UM coverage as Tolbert's liability policy provided $25,000 in coverage. The damages sustained by Robinson's vehicle did not come anywhere close to exceeding that policy limit. Accordingly, the trial court was not manifestly erroneous in denying Robinson's claim against Safeway for penalties and attorney fees.

CONCLUSION
At appellant's costs, the judgment is AFFIRMED.
NOTES
[1] The attorney for Encompass had asked Larsen, "Was he essentially back to the same condition on April 29th as he had been back on  what was it  March 13, 2000?" It is possible the attorney was referring to March 13, 2001.