936 So.2d 233 (2006)
Brett EDWARDS and Candy Edwards, Plaintiffs-Appellees,
v.
LCR-M CORPORATION, INC.; Lee Carr; and Travelers Indemnity Company of Illinois, Defendants-Appellants.
No. 41,125-CA.
Court of Appeal of Louisiana, Second Circuit.
July 12, 2006.
*236 Nelson, Zentner, Sartor & Snellings, L.L.C., by Thomas G. Zentner, Jr., Monroe, for Appellants.
Pendley Law Firm, by Patrick W. Pendley, Stan P. Baudin, Plaquemine, Benjamin F. Marshall, Monroe, for Appellees.
Before GASKINS, CARAWAY and MOORE, JJ.
CARAWAY, J.
The plaintiff was hit in the head with a PVC pipe being loaded onto a truck by a temporary employee of a plumbing wholesaler. Claiming that he experienced pain, headaches, dizziness, insomnia and equilibrium imbalance from a concussion, as well as long-term low back and neck pain from this blow, plaintiff and his wife, individually, and on behalf of their minor son, instituted suit against the employee, his employers *237 and their liability insurers, seeking damages for bodily injury, pain and suffering, past and future medical bills, lost wages, emotional distress, permanent disability and loss of consortium. The court determined that plaintiff failed to prove that his complaints of chronic back and neck pain were caused by the accident. The judge awarded damages to plaintiff for the concussion injury for a term following the accident and reduced the award by plaintiff's 40% comparative fault. The defendants appeal the judgment, seeking reversal of the damage award. The plaintiff also appeals, seeking an increase in the damage award. For the reasons that follow, we affirm the judgment.

Facts
The plaintiff, Brett Edwards, was a subcontractor for his brother Mark's plumbing business, Edwards' Heating, Plumbing & Air in West Monroe, Louisiana. On September 30, 1998, the brothers traveled in Mark's business truck to LCR-M, Corporation, Inc. ("LCR-M"), a plumbing wholesaler, to pick up an order of PVC pipe for a job. The truck was equipped with a rack for carrying pipe. The rack extended around the bed of the truck to a height slightly above the top of the cab. Pipe loaded on the rack could therefore extend over the truck's cab.
At LCR-M, Mark entered the warehouse and waited at the counter as Brett drove the truck into the pipe yard to have the 500 feet (25 pieces) of twenty-foot, schedule 40 PVC pipe loaded onto the truck. Each pipe was 1-1/2 inches in diameter and weighed approximately ten pounds. Brett parked the truck approximately eight feet away from the pipe storage racks and four feet past the particular pipe rack on which the 1-1/2-inch pipe was loaded. The pipe was stacked perpendicular to the truck and had to be pulled out from the rack and turned and placed on the truck. The pipe was located on the driver's side of the truck. Loading the truck was a temporary employee of LCR-M, Lee Carr, who was provided to LCR-M by Willstaff, Inc. ("Willstaff"), a temporary staffing company.[1] Carr, Brett and Mark testified at trial regarding the events leading up to and following the accident.[2]
Carr began working for LCR-M in the last half of August 1998, while waiting to transfer to a new college. Because of Carr's temporary status, he was assigned pipe yard work loading and unloading trucks. Carr was not trained on loading and unloading pipe but was instructed on tying pipe to truck racks to prevent sliding. Customers commonly brought their trucks into the pipe yard for loading. Carr was not prohibited from loading pipe on a truck while a customer either remained in or stood near the vehicle that was to be loaded. No one was required to wear a hard hat during the loading process.
Carr's method and sequence of loading the pipe was disputed. Carr testified that he had loaded eight to ten pieces of pipe when Brett suddenly exited the truck. At that moment, Carr stated that he "was probably picking a piece [of pipe] up" and moving it toward the truck's rack when the accident occurred. Carr claimed that the end of the pipe which hit Brett had first swung onto the rack and bounced or flexed back to hit Brett on the top of the head. Carr testified that Brett flinched, but did *238 not fall to the ground. Brett contends that the first piece of pipe loaded by Carr onto the truck struck him in the head with full force and caused him to fall face down on the ground. He testified that after he exited the truck, he saw Carr "holding ... up" a piece of pipe. The next thing he knew, the pipe "[was] coming right at me."
After the incident, Brett went to Mark's location inside the warehouse to tell him what had happened. Mark left the office and approached Carr just about the time he finished loading the 25 pieces of pipe onto the truck. Mark claimed he saw Carr hoisting a pipe up on its end, twenty feet high, and let it fall into the truck rack. The brothers surmised that Carr loaded the pipe that way the whole time and that the pipe that hit Brett missed the truck entirely. This allowed the full force of the pipe to cause the injury. As Mark confronted Carr about his loading technique, he said his head was grazed by a piece of pipe bouncing from the top of the truck. Carr did not contest this and recalled Mark cautioning him.
Carr's loading technique also allegedly dented the top of Mark's truck cab. Primarily because of this property damage claim, Carr reported the accident to Edward Lepp, the general manager of LCR-M, on the same evening. The next day, Mark returned to LCR-M in his truck and Lepp photographed the vehicle. Mark and Carr both said Lepp showed Carr the proper loading technique.
After the accident, Mark took Brett to Glenwood Regional Medical Center emergency room where he was diagnosed with a concussion and scalp contusion. Brett complained of feeling dazed and having a headache and pain to the top of his head. The emergency room record also noted tenderness at the scalp and cervical spine. Brett was diagnosed with post-concussion syndrome (PCS) in November of 1998. The headaches and dizziness associated with PCS improved by 60% by March of 1999 and were almost completely subsided in July of 1999. After the accident, Brett also complained of neck and shoulder pain which persisted up until the time of trial. Fifteen months after the accident, Brett began to experience lower back pain, which was also unresolved at trial. Brett returned home to Baton Rouge shortly after the accident. Thereafter, he tried to go back to work with his brother twice but failed. He eventually returned to self-employment as a cement finisher in September of 1999. He professes the ability to work, but only while in pain.
On March 1, 1999, Brett and his wife, Candy, individually and on behalf of their minor son, Andrew, sued Carr, LCR-M and its general liability insurer, Travelers Indemnity Company of Illinois, and Willstaff and its general liability insurer, Frontier Insurance Company, seeking damages for the injuries Brett received as the result of the blow to his head including long-term neck and lower back pain. The matter proceeded to bench trial in 2005.
Upon a recess by the court at the trial, the parties demonstrated the conflicting loading methods for the trial court in the court parking lot. The record reflects that an identical piece of 20-foot pipe and Mark's truck were used in the demonstrations. In the trial court's written reasons for judgment, it noted that "significantly different degrees of force and manner of loading comprised the two demonstrations."
In rendering judgment in favor of plaintiffs, the court accepted Carr's testimony about how the pipe struck Brett. The court determined that the injuries caused by the blow to his head were of a short duration and denied recovery for his long-term cervical and lumbar problems. The damage award of $61,804.52 was reduced *239 by Brett's 40% comparative fault for a sum of $37,082.72. Specifically, the court awarded Brett general damages of $22,500, loss of consortium damages to Candy in the amount of $6,750 and $4,500 to Andrew, lost wages from October 1998 through July 1999 of $16,996.24, and medical expenses of $11,088.28. These appeals by both parties ensued.

Discussion

I.
On appeal, both parties claim freedom from fault in the accident and thus allege error in the trial court's liability and comparative fault determinations. Additionally, Brett argues that the trial court erred in accepting the testimony of Carr as to the facts of the incident.
Our review of the factual findings in this case are governed by the manifest error/clearly wrong standard of review. It is a well-settled principle that an appellate court may not set aside a trial court's finding of fact unless it is manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly wrong. Rosell, supra; Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985); Arceneaux, supra. Where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra.
The reviewing court must always keep in mind that, if a trier of fact's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that, if it had been sitting as trier of fact, it would have weighed the evidence differently. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong, but whether the factfinder's conclusions were reasonable. Stobart, supra; Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305.
The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under La. C.C. art. 2315. This approach provides an analytical framework for evaluation of liability. One analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendants' substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiffs' injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). Lemann v. Essen Lane Daiquiris, Inc., 05-1095 (La.3/10/06), 923 So.2d 627. A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Id.
*240 A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. Lemann, supra; Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229, 233. Whether a duty is owed is a question of law. Lemann, supra; Peterson v. Gibraltar Savings and Loan, 98-1601, 98-1609 (La.5/18/99), 733 So.2d 1198, 1204. In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. Lemann, supra; Socorro v. City of New Orleans, 579 So.2d 931, 938 (La.1991). The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty. Lemann, supra.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. Maranto v. Goodyear Tire & Rubber Co., 94-2603 (La.2/20/95), 650 So.2d 757; Bradshaw v. Brookshire Grocery Co., 38,960 (La.App.2d Cir.10/27/04), 886 So.2d 623. Proof must be by a preponderance of the evidence. Maranto, supra. The test for determining the causal relationship is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Id. Before recovery can be granted for aggravation of a preexisting condition, a causative link between the accident and the victim's current status must also be established. Lamb v. Berry, 35,347 (La.App.2d Cir.12/28/01), 803 So.2d 1084.
Before considering the trial court's assessment of the parties' fault, we will review the trial court's determination of the facts of the accident for manifest error. There were clearly two significantly opposing views of Carr's conduct loading the truck and the extent of the blow to the top of Brett's head. All issues raised in this appeal rest upon the trial court's choice of Carr's version of the event which Brett now claims to be unreasonable and contrary to the evidence.
First, however, in contrast to both opposing views, the plaintiff's evidence also presented a photograph (Ex. P-10) of what appears to be a safer and more appropriate manner for loading the pipe. The photo depicts a man holding a 20-foot length of PVC pipe in a balanced position near the middle of the pipe. The man is seen approaching the back of the truck while resting the front end of the pipe on the truck's pipe rack above the tailgate. The man, as the testimony indicated, could then slide the pipe forward using the above described resting point to steady the pipe as it contacts the front portion of the rack near the cab. This method would apparently diminish or prevent the possibility of the pipe banging down on the top of the truck cab and bouncing or flexing out of control. All agree that this method of handling the pipe during the loading process was not utilized by Carr.
The trial court's written ruling rejected the view that Carr was raising each pipe vertically as he withdrew the pipe from the storage rack. This assertion was based upon Carr's loading technique, which Mark claimed he witnessed after the accident. It was circumstantial and specifically denied by Carr. Elevating the pipe in this way, by holding it at one end, would have presented problems for controlling the motion of the other end of the flexible pipe. Obviously, it would have created greater force at the uncontrolled end as the pipe fell toward the rack on the truck or directly to the top of Brett's head.
The exact manner of loading asserted by Carr is not as clear from the record. *241 However, the specific facts provided reveal the following:
(i) Carr held the pipe three to four feet from one end.
(ii) Carr did not pull the pipe from the storage rack and raise it vertically so that the end of the pipe which hit Brett did not fall 20 feet before impact with his head.
(iii) Carr did not move his hold on the pipe to its center to better control the pipe and load the pipe from the rear of the truck as shown by the example illustrated in the photo (P-10).
(iv) Carr was not standing behind the tailgate of the truck but was in a position on the driver's side of the vehicle to see Brett in full view as the pipe struck him.
(v) From the motion Carr gave to the pipe, the end which hit Brett first landed on the front pipe rack near the cab and then bounced or flexed two to three feet high back toward Brett's head which was approximately near the same height as the top of the cab.
(vi) Carr was immediately able to regain some control of the pipe after its contact with Brett's head and move it directly back onto the truck.
From these facts and the facts pertaining to the location of the truck in relation to the pipe storage rack, Carr's manner of loading must have involved his pulling of the pipe from the storage rack and swinging it toward the truck while holding it at a position close to one end. The necessary height of the end of the pipe would have only been enough to clear the top of the truck's pipe rack before touching down and bouncing back to hit Brett. In any event, the critical fact from Carr's description, as accepted by the trial court, is that the pipe first bounced on the pipe rack. This would have diminished the severity of the blow to Brett's head. This fact is not contradicted or made improbable by the configuration of the truck and the pipe storage rack or the logistics of loading, so the trial court could accept Carr's description of the event. Additionally, Carr was the only attentive eyewitness, as he actually directed the motion of the end of the pipe which hit Brett. Finally, the trial court witnessed a demonstration by Carr maneuvering the pipe, and while we cannot review that demonstrative evidence from the record, Brett made no objection to the manner in which Carr performed it.
The specific finding of fact, which we therefore accept as being free from manifest error, was stated in the trial court's ruling as follows:
Concerning the force with which the length of PVC pipe made contact with Brett Edwards' head, the preponderance of the evidence establishes that the force of the contact was more likely as described by Mr. Carr rather than as demonstrated by the plaintiff's brother, Mark Edwards, during the course of the trial. The preponderance of the evidence also establishes, however, that the contact between the PVC pipe and Brett Edwards' head, however minimal, resulted in injuries.
As indicated above, the trial court's acceptance of Carr's account of the accident is crucial. First, the blow to Brett's head was minimal, and the trial court continuously repeated that finding in dealing with the extent of Brett's injuries. Perhaps even more significant is the trial court's rejection of Brett's claim that he was driven to the ground, which suggests a serious credibility problem for Brett's further reporting of subjective back and neck pain.
Next, concerning LCR-M's claim to be free from fault, the legal duty of *242 LCR-M was to provide adequate and reasonable safety to its employees and customers in the loading of materials sold from its warehouse. Carr received no training in proper loading techniques as a temporary employee, and he was not cautioned about customer actions and the need for warning the customer about the loading process. Carr conceded that he did not load the truck in the safest manner and did not deny that after the first accident, he also hit Mark with a pipe. Under the circumstances, we find no error in the trial court's holding that LCR-M, through its employee's conduct, breached its duty of care owed to the customer which it allowed into the loading area of its warehouse.
Despite the fact that Brett was not directly warned by Carr or other LCR-M employees about the loading process or prevented from driving the truck into the loading area, the trial court determined that Brett received ample warning of Carr's roughhouse manner of handling the pipes by the way he banged the other pipes upon the truck rack and cab. The trial court's ruling clearly credited Carr's account that many pieces of pipe had already been loaded. Therefore, whether Brett then suddenly emerged from the cab or had been standing beside the cab for a longer period of time before being struck, he had a duty to take notice of Carr's mishandling of the pieces of pipe. His breach of that duty implicates our comparative fault principles.
Discussing our state's leading case on comparative fault, the court in Gibson v. State, DOTD, 95-1418 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1004, writs denied, 96-1862, 96-1895, 96-1902 (La.10/25/96), 681 So.2d 373,374 stated:
Prior to the adoption of comparative fault in Louisiana, the doctrine of last clear chance was created to escape the harsh effects of the contributory negligence defense which, in its strict application, operated as an absolute bar to a plaintiff's recovery. See Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400, 403 (La.1978). In a comparative fault analysis, whether the plaintiff had the last clear chance to avoid an accident is a determination for the trier of fact. In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the court explained the appropriate considerations for a comparative fault analysis, as follows:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was, created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

Watson, 469 So.2d at 974. Thus, the principles considered in the application of the last clear chance doctrine are subsumed by the comparative fault analysis. The application of the last clear chance doctrine is not, therefore, a separate consideration for the trier of fact.
From this understanding of the law and in particular, the last clear chance concept, we find the trial court's assessment of fault for Brett's actions supported by the facts. While the events occurring outside the truck cab before Brett's exit involved *243 movement of relatively light and flexible pipe, there was some danger present which Brett should have avoided. The finding that he was inattentive after hearing the noise from loading eight to ten pipes onto the truck means that Brett's exercise of reasonable care could have prevented the accident. Conversely, his inattentive behavior contributed to causing this accident, and we will not reverse the trial court's finding of fault.
The 40% allocation of fault to Brett, however, presents a closer question. Nevertheless, the "allocation of shares of negligence ... is not an easy task for the factfinder." Watson v. State Farm Fire and Cas. Ins. Co., supra at 971. As further reviewed by our supreme court in Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, while the manifest error rule applies to fault allocation, the factfinder has discretion for the setting of the percentage of fault, since that judgment is similar to the determination of the quantum for general damage awards. Once fault on the part of multiple parties is found, the percentage actually chosen by a factfinder to be assigned to each party at fault is insusceptible of precise measure. Thus, in keeping with the deference owed the factfinder for general damage awards, Clement held that "[a]fter the court of appeal finds a `clearly wrong' apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." Id. at 611.
For the standard of appellate review, this combination of the manifest error test with additional respect for the trial court's discretion for the setting of the actual percentage of fault is now applicable. Also, under that standard, because of the factfinder's considerations of witness credibility and inferences of fact, this court may not substitute its own evaluations and inferences when the factfinder's choices are reasonable and permissible.
In this case, considering the nature of the conduct of the parties, the trial court could view Brett's action in suddenly emerging from the truck as a key factor which amounted to a direct and significant cause of the accident. Nevertheless, the trial court correctly viewed Carr, who was clearly more observant of the loading process, to be the party responsible for the majority of the fault. A downward adjustment of Brett's percentage of fault by this court is not clearly warranted and would invade the discretion of the factfinder in setting the percentages of fault. The trial court's determination of fault for both parties and its allocation of the percentage of fault are affirmed.

II.
The trial court awarded $22,500 to Brett for his head injury which resulted in PCS. From its award of ten months of lost wages, the trial court's judgment indicates that the symptoms of PCS were resolved approximately during that time period. The trial court's written ruling, however, went to great lengths in its conclusion that Brett's other claims for neck and back injuries were not caused by the relatively minor impact of the flexible PVC pipe but were instead congenital. Brett makes no argument that the general damage award for the concussion injury was in error, but does argue error in the trial court's refusal to award damages for the back and neck injuries. Defendants also appeal the damage award.
A claimant's disability is presumed to have resulted from an accident if, before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest *244 themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition. Housley v. Cerise, supra. To obtain the benefit of this presumption of causation, the plaintiff must show (1) that he was in good health prior to the accident at issue, (2) that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterward, and (3) through evidence, either medical, circumstantial, or common knowledge, a reasonable possibility of causation between the accident and the claimed injury. Juneau v. Strawmyer, 94-0903 (La.App. 4th Cir.12/15/94), 647 So.2d 1294.
In addition, the assessment of damages, i.e., the finding of the appropriate amount of damages in a case, is also a factual determination entitled to great deference on review. The role of the appellate court in reviewing general damages is not to decide what it considers to be an appropriate award of damages, but, rather, to review the exercise of discretion by the lower court. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Robinson v. Tolbert, 40,488 (La.App.2d Cir.1/20/06), 920 So.2d 346. The correct procedure for determining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. In a personal injury case, the defendant takes her victim as she finds her and is responsible for all natural and probable consequences of her tortious conduct. When the defendant's conduct aggravates a preexisting condition, she must compensate the victim for the full extent of the aggravation. Id.
We find no manifest error in the trial court's award of damages to Brett relating to PCS. The undisputed medical records presented into evidence document that Brett was diagnosed with a concussion and scalp contusion after the accident. He complained of constant head, neck and shoulder pain through October of 1998. In November of 1998, Brett continued to complain of headaches and dizziness to his Baton Rouge physician, Dr. Kyle Dean. Dr. Dean referred Brett to a neurologist, Dr. Charles Kaufman, to evaluate the headaches and dizziness which Dr. Dean assumed were related to the accident.
Dr. Kaufman first saw Brett on November 17, 1998. Brett described the accident and said the force of the blow to his head caused by a PVC pipe drove him to the ground. Brett complained of headaches and stiffness in the back of his neck, dizziness, difficulty in following through with tasks and being bothered by loud noise and bright light. Dr. Kaufmann noted Brett's complaint of pain radiating into his shoulders had improved since the accident. He confirmed that Brett had a closed head injury with concussion caused by the accident. Brett was diagnosed with PCS. His symptoms were expected to resolve in time. By March 1, 1999, Brett continued to complain of headaches and difficulty concentrating but considered himself 60% improved. Dr. Kaufman also noted signs of improvement and estimated Brett would fully recover. By July 1999, the headaches were better and Brett told Dr. Kaufman he could return to work. Dr. *245 Kaufman testified that by July of 2000, Brett's headaches due to PCS had resolved.
The uncontradicted medical evidence presented at trial clearly indicates that Brett received a concussion as a result of the blow to his head. Immediately thereafter, Brett began experiencing headaches, dizziness and neck stiffness which Dr. Dean related to the accident. Brett reported no such pre-existing conditions to his physicians and likewise testified that he had not experienced the same problems before the accident. Additionally, Dr. Kaufman's testimony establishes that the symptoms of Brett's PCS were substantially resolved by July of 1999, some ten months after the accident. As for these concussion-related injuries, LCR-M presented no contrary medical evidence to suggest that Brett's headaches, dizziness and neck stiffness which had resolved by July were not accident related. From this evidence, the trial court could have reasonably concluded that the duration of the concussion's side effects, extending through July of 1999, were caused by the blow to Brett's head. Thus, we find no error in this determination.
Brett's claim for damages for his neck pain presents a more difficult issue. Dr. Kaufmann testified that because Brett continued to complain of cervical stiffness with pain radiating down his shoulder, he ordered an ENG or nerve conduction study in November of 1999. The test detected bilateral disc irritation of the C-7 nerve root consistent with bilateral C-7 radiculopathy. Radiculopathy is an abnormality of cervical nerve root. In his deposition, Dr. Kaufman testified that Brett's neck pain is consistent with a blow to the head and that the incident "could very easily cause the problems ...." He also admitted, however, to many other causes for this type of disc bulge including everyday wear and tear, twisting, sneezing or simple maneuvers. He agreed that an individual involved in heavy labor puts more strain on the disc.
In August of 2003, Brett saw a neurosurgeon, Dr. John Clifford, for continued neck pain, headaches, low back and arm pain. At trial, Dr. Clifford's deposition was admitted into evidence. Dr. Clifford testified that Brett's neck pain was attributable to arthritis in Brett's neck, asymptomatic degenerative changes that became symptomatic after the accident, and C-6 radiculopathy. Dr. Clifford also testified that if the pipe which struck Brett had completely missed the truck and hit him directly, the trauma to the head probably caused the cervical injuries. He conceded however that under the scenario of the pipe hitting the truck first and then hitting Brett's head, "it [was] less likely" that the blow caused the neck problems. On cross-examination, Dr. Clifford testified that Brett's arthritic neck was consistent with his age.
In rejecting Brett's claim for damages for his neck pain, the trial court determined that the medical evidence viewed as a whole established that it "was equally likely that the plaintiff's complaints of ... neck injury" were the result of "pre-existing conditions, apparently congenital in nature, and/or the product of his history of manual labor as a concrete finisher." The trial judge ultimately determined that the opinions of Brett's physicians on the issue of causation remained "equivocal" and insufficient to prove Brett's entitlement to damages for radiculopathy.
After closely reviewing the evidence before us, we can find no manifest error in this determination. Indeed, Brett complained of neck pain after the accident. Yet, Dr. Kaufman clearly testified that neck pain was another symptom of PCS which would also resolve with the other *246 symptoms. The crucial inquiry then becomes whether Brett has demonstrated more probably than not that the pain relating to his radiculopathy was caused directly or aggravated by the accident. The trial court correctly observed that the only causation testimony from Dr. Kaufman relating to the neck injuries was that they were "consistent" with the accident and "could very easily" cause the neck problems. Likewise, Dr. Clifford based his opinion that more probably than not the radiculopathy was caused by the accident on a set of facts in which the pipe missed the truck and hit Brett with full force. He admitted that such causation was "less likely" if the pipe first hit the truck. Of course, both of the doctors' opinions were based upon Brett's history of the accident which the trial court clearly rejected, including his claim that the full force of the pipe hit him on the head. This fact became crucial to Dr. Clifford's conclusions and arguably discredits his opinion on the issue of causation for the neck injuries. Likewise, Dr. Kaufman testified that he based his opinion on the history Brett gave him. In these circumstances, we find that the trial court could reasonably question the viability of the physicians' ultimate conclusions regarding these issues. Without the existence of any other unequivocal medical evidence causally relating Brett's neck injuries to the accident, all that remained was ambiguous evidence merely raising a possibility that the accident caused the radiculopathy. The trial court could correctly conclude that such speculative evidence was insufficient to prove Brett's entitlement to additional damages.
The evidence relating to Brett's back injuries shows that it was not until January 3, 2000, that Brett first complained of low back pain to Dr. Kaufman. On that date, Dr. Kaufman testified that Brett "looked quite well and just didn't have the look of somebody that was in a lot of severe pain." Because of the low back pain complaints, however, he ordered an MRI which showed spondylolisthesis or a slippage of some vertebrae on top of the other. He indicated that this is usually congenital and not necessarily due to trauma. Brett saw Dr. Kaufman twice more and, during the last visit, said his back was better. Dr. Kaufman ultimately agreed it was unlikely the back condition was related to the accident.
Likewise, Dr. Clifford testified that Brett suffered from moderate spondylolisthesis. He noted that the appearance of symptoms several months after the accident was unusual. It was difficult for him to say whether Brett's pain was directly related to the accident or just part of the lumbar spondylolisthesis.
The trial judge rejected Brett's claim for back injury damages after discrediting Dr. Clifford's opinion which was based upon the facts it had rejected, namely that the force of the blow to Brett's head caused him to fall. Based upon the medical testimony presented at trial, we can find no error in this determination. Clearly, Dr. Kaufman failed to ultimately conclude that the back injuries were more probably than not caused by the accident because of the length of time between the accident and the emergence of Brett's back complaints in January of 2000. Dr. Clifford agreed with Dr. Kaufman's conclusions about Brett's back condition and added that the congenital back problems would only have become symptomatic if Brett fell as the result of the blow to the head, again a fact rejected by the trial court. Accordingly, we find the trial court's conclusions relating to the back injuries to be reasonably supported by the record.
The final issue raised by Brett concerns the admissibility of an unedited surveillance tape into evidence. The video shows *247 Brett working as a concrete finisher in 2003. While the trial court discussed the video in its written ruling, it indicated that its previous conclusion denying damages for Brett's congenital neck and back injuries made Brett's work activities in 2003, in pain or otherwise, of little relevance.
The admission of surveillance tapes into evidence is largely within the discretion of the trial court. Olivier v. LeJeune, 95-0053 (La.2/28/96), 668 So.2d 347; Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App.2d Cir.12/6/00), 774 So.2d 1093, writ denied, 01-0026 (La.3/9/01), 786 So.2d 735. From our review, we can find no reversible error in the admissibility of the tape into evidence. It was within the broad discretion of the trial court to determine the appropriate weight to be given to all of the evidence. In these circumstances reversible prejudice has not been shown.

Conclusion
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally between the parties.
AFFIRMED.
NOTES
[1] Carr's checks were issued by Willstaff.
[2] Another employee of LCR-M who worked on the day of the accident. Donovan Browning, testified that he recalled Brett coming to the counter where he worked after the accident, rubbing the top of his head. He did not recall that Brett appeared to be in any distress.