# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-001

**LAURA M. ANDERSON**

**VERSUS**

**STATE OF LOUISIANA, ET AL.**

************

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 74738-A
HONORABLE GARY J. ORTEGO, DISTRICT JUDGE

************

## SYLVIA R. COOKS
### JUDGE
************

Court composed of Sylvia R. Cooks, Phyllis M. Keaty, and Van H. Kyzar, Judges.

### AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

Chuck D. Granger
Granger Law Firm
130 W. Vine Street
P.O. Drawer 1849
Opelousas, LA 70571-1849
(337) 948-5000
COUNSEL FOR PLAINTIFF/APPELLANT:
    Laura M. Anderson

David P. Salley
A. Jacob Culotta, Jr.
Salley, Hite, Mercer & Resor, LLC
365 Canal Street, Suite 1710
New Orleans, LA 70130
(504) 566-8800
COUNSEL FOR DEFENDANTS/APPELLEES:
    State of Louisiana, Office of Homeland Security and Emergency Preparedness and
    Marlys Sanders

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

On April 23, 2013, Plaintiff, Laura M. Anderson, was driving her vehicle, a 2004 GMC Envoy, on West Lasalle Street in Ville Platte, Louisiana. Her vehicle collided with a 2012 Toyota Camry driven by Defendant, Marlys Sanders, who was in the course and scope of her employment with the State of Louisiana, Office of Homeland Security and Emergency Preparedness.

The parties' version of the events that led to the collision was vastly different. Ms. Sanders claimed she was being closely followed in the right lane of travel by Ms. Anderson's SUV. Ms. Sanders noted Ms. Anderson was close enough behind her that she could see Ms. Anderson was talking on a cell phone. Despite her slowing down her speed considerably, Ms. Sanders testified Ms. Anderson did not change lanes to pass her vehicle. Noticing how close Ms. Anderson's SUV was to her vehicle, Ms. Sanders stated she put her blinker on and began to move into the left lane of travel to allow Ms. Anderson to proceed past her vehicle. However, as she moved into the left lane she stated she heard an engine "rev up" and the vehicles slightly collided.

Ms. Anderson testified she was proceeding in the left lane of West Lasalle Street traveling approximately twenty-five miles per hour. She noticed the vehicle operated by Ms. Sanders a little ahead of her in the right lane. According to Ms. Anderson, the vehicle driven by Ms. Sanders drifted into her lane. Despite blowing her horn to alert Ms. Sanders and slamming on her brakes, the two vehicles collided.

Plaintiff presented the testimony of Nathaniel Thomas, who was a purported eyewitness to the accident. It was acknowledged that Mr. Thomas was married to Ms. Anderson's father's cousin. Mr. Thomas testified he was standing in the parking lot of the nearby Department of Motor Vehicles (DMV). Mr. Thomas

stated he saw the two vehicles prior to impact, but also stated he was not really paying attention to the vehicles. However, he heard a horn blow and then saw the vehicles collide. He stated the car "crossed over into the left lane and hit the SUV."

Officer Blade Bonnette, with the Ville Platte Police Department, was called to the scene. Officer Bonnette did not witness the accident, and the vehicles were moved off the roadway prior to his arrival. After interviewing the parties and Mr. Thomas, he did not issue any tickets to either driver.

Plaintiff alleged she suffered injuries to her neck, right shoulder, right arm, back and both legs. A Petition for Damages was filed on April 15, 2014. A jury trial commenced on March 13, 2017 .

Plaintiff alleged the accident was caused solely by the negligence of Ms. Sanders for failing to maintain a proper lookout and keep her vehicle under control. Plaintiff maintained Ms. Sanders changed lanes when it was unsafe to do so and failed to see what she should have seen. Plaintiff also alleged her injuries caused her past, present and future medical expenses and pain and suffering.

After a three-day trial, the jury, after deliberating for twenty minutes, returned a unanimous verdict. The jury first found Plaintiff and Ms. Sanders both fifty percent (50%) at fault in causing the subject accident. The jury then found Plaintiff did not sustain any injury as a result of the accident and accordingly awarded her no general or special damages.

Plaintiff filed a Motion for New Trial and/or a Motion for Judgment Notwithstanding the Verdict (JNOV) as to the findings of the jury as to both negligence and damages. They contended the evidence adduced at trial clearly demonstrated that Ms. Sanders was one hundred percent (100%) at fault in causing the accident and that she suffered compensable injuries from the accident.

3

The trial court issued oral reasons denying the Motion for New Trial and/or JNOV. The trial court stated it found the jury was attentive and that the evidence was sufficient to sustain the apportionment of fault reached by the jury. The trial court similarly found the evidence was sufficient for the jury to find Plaintiff did not suffer any injuries and/or damages as a result of the accident.

Plaintiff has appealed the lower court judgment, asserting the following assignments of error:

1. The jury was manifestly erroneous in finding Plaintiff fifty percent (50%) at fault in causing the accident.

2. The jury was manifestly erroneous in finding Plaintiff suffered no damages or injuries as a result of the accident.

3. The trial court committed legal error in failing to grant Plaintiff's motions for post-trial relief.

## ANALYSIS

### I.    *Jury's Apportionment of Fault.*

In her first assignment of error, Plaintiff contends the jury manifestly erred in finding she was fifty percent (50%) at fault in causing the subject accident. The apportionment of fault is a finding of fact reviewed by this court under the manifest error standard of review. *Stobart v. State, Dep't of Transp. and Dev.*, 617 So.2d 880 (La.1993). Under this standard, we must review the record in its entirety and determine if the jury's factual findings were clearly wrong or manifestly erroneous. *Id*. After reviewing the entire record, an appellate court may not reverse reasonable findings of the trial court, even if the appellate court would have reached a different conclusion if sitting as the trier of fact. *Fontenot v. Patterson Ins.*, 09-669 (La. 10/20/09), 23 So.3d 259.

As was briefly discussed above, the parties' version of the events that led to the collision was vastly different. Plaintiff testified she was proceeding in the left lane of West Lasalle Street traveling approximately twenty-five miles per hour,

4

heading to a Dollar General store to shop. She stated she came nearly side by side with Ms. Sanders' vehicle, which was traveling in the right lane of travel on West Lasalle Street. Plaintiff stated she saw "paper or a binder in front of her on a steering wheel and there was something in her hand" that "looked like a cell phone." According to Plaintiff, the vehicle driven by Ms. Sanders drifted into her lane. Plaintiff did not see any turn signal activated on Ms. Sanders' vehicle. Despite blowing her horn to alert Ms. Sanders and slamming on her brakes, the two vehicles collided.

Plaintiff also presented the testimony of Mr. Thomas, who stated he saw the accident occur. Mr. Thomas acknowledged at trial that he was married to Plaintiff's father's cousin. Mr. Thomas testified he was standing right outside the door of the Department of Motor Vehicles (DMV). Mr. Thomas stated he saw the two vehicles prior to impact, but also stated he was not really paying "direct attention" to the vehicles. He stated he did not see any activated turn signal on Ms. Sanders' vehicle prior to the accident. He acknowledged on cross-examination he could not be sure if one of the vehicles changed lanes right before the collision, or if the SUV was behind the car prior to changing lanes. Mr. Thomas' previous deposition testimony stated he believed Ms. Sanders' vehicle slowed down prior to the collision, though at trial he first stated Ms. Sanders' vehicle did not slow down.

Mr. Thomas also testified that he approached Plaintiff's vehicle to see if she was okay following the accident. He stated he did not approach Ms. Sanders' vehicle at the scene. Despite acknowledging he did not approach Ms. Sanders' vehicle at the scene, he testified he saw papers in the front and back seat of her vehicle. On cross-examination, Mr. Thomas was asked how he was able to see papers in Ms. Sanders' vehicle, and testified as follows:

Q. And you said you did not speak to Ms. Sanders?

A. No.

Q. You said you did not approach her vehicle?

A. I didn't.

Q. How were you able . . . but you were able to see there was some papers?

A. When she passed in front of the DMV I saw the cars as they passed and I looked across there and I could see that she had some stuff in her backseat and she had stuff in her front seat on the passenger side.

Q. And you saw that from standing on the sidewalk?

A. Oh yes sir.

Officer Bonnette was the investigating officer called to the scene of the accident. His prior deposition was read to the jury at trial. Officer Bonnette did not witness the accident, and the vehicles were moved off the roadway prior to his arrival. He simply reiterated what the parties to the accident and Mr. Thomas related to him at the scene. After interviewing the parties and Mr. Thomas, he did not issue any tickets to either driver.

Ms. Sanders testified on the date of the accident she was traveling from Lake Charles to the Police Jury building in Ville Platte on official business. She stated she first noticed Plaintiff's vehicle when it quickly came up behind her in the right lane. Ms. Sanders noted Plaintiff was close enough behind her that she could see Plaintiff was talking on a cell phone. Despite her slowing down her speed considerably, Ms. Sanders testified Ms. Anderson did not change lanes to pass her vehicle. Being concerned how close to her vehicle that Ms. Anderson's SUV was, Ms. Sanders stated she put her blinker on and began to move into the left lane of travel to allow Ms. Anderson to proceed past her vehicle. However, as she moved into the left lane she stated she heard an engine "rev up" and the vehicles slightly collided. Ms. Sanders gave the following description of the events that occurred immediately before the accident:

6

. . . So anyway I was just kind of keeping my eye out and I turned on to LaSalle and I, at some point, a few minutes later, realized that there was a very large SUV following me in the same lane (inaudible) very close to me and the reason I say it was close is because I could look into my rear view mirror and tell that the lady in the SUV was on her telephone and I said, well if I slow down considerably then she can go ahead and pass me and I don't have to interrupt. That's why I was in the right lane because I always choose the right lane to keep from impeding traffic which usually the faster traffic goes to the left lane anyway, but I . . . I . . . slowed considerably down. I probably, I'm gonna say between 10 and 15 miles an hour is all the speed I was doing because I was trying to watch her and watch where I was on the road to, to see where I got to the police jury and when she failed to go ahead and come around me then I said, well I will turn my blinker on and I'll just barely ease over in to the left lane maybe where she can see me because she was terribly close and of course when I did and I probably had not gotten but my front tire over the line when I heard her engine rev up. I didn't see her because as she came around me she was in my blind spot like you do when you come around you're in somebody's blind spot but I heard her motor rev up and when I did I tried coming back across and I must not have been, I don't know, just barely across the center line when she just glancedly [sic] hit me and when we stopped, you know, she . . . I was probably five or six foot in front of her when we come to s stop after she . . . she hit me.

The record establishes the jury was presented with two vastly different scenarios of how the accident occurred. The officer dispatched to the scene could offer little other than the parties' version of the events, as the vehicles had been moved from the roadway prior to his arrival. Mr. Thomas, the eyewitness offered by Plaintiff, largely supported Plaintiff's version of events, but acknowledged he was not paying "direct attention" to the vehicles. Despite his lack of focus and the fact that he was standing in the DMV parking lot across the street from the accident scene, he testified he was able to see papers in the back and front seat of Ms. Sanders' vehicle. He also stated at trial he believed Ms. Sanders' vehicle did not slow down prior to the accident, but was forced to acknowledge he testified differently in his earlier deposition testimony that Ms. Sanders' vehicle did slow down just before the accident. He also admitted on cross-examination he could not be sure if one of the vehicles changed lanes right before the collision, or if the SUV was behind the car prior to changing lanes.

Our appellate standard of review requires that we affirm the reasonable findings of the jury, even if we may have reached a different conclusion if sitting as the trier of fact. Considering the conflicting testimony of the witnesses, we cannot say the jury was manifestly erroneous or unreasonable in its apportionment of fault in this case. Thus, we affirm the jury's apportionment of fault in this case

## II.    Jury's Finding that Plaintiff Suffered No Injuries in the Accident.

The medical testimony was clear that Plaintiff suffered from numerous pre-existing conditions prior to the subject accident. Plaintiff testified that prior to the April 23, 2013 accident she was treated for diabetes, high blood pressure, swelling to both legs and feet, heal spurs, bone spurs and morbid obesity.

She was involved in a January 2009 automobile accident. As a result of that accident, Plaintiff complained of injuries to her neck, left arm, back and left leg. She became disabled due to these injuries, along with her previous problems stemming from her diabetes, high blood pressure and obesity. Plaintiff was also involved in a May 2012 automobile accident and complained of similar injuries as she suffered in an earlier 2009 automobile accident. The testimony of the physicians that treated Plaintiff clearly establishes she had a plethora of pre-existing physical maladies. However, at issue herein is whether the medical testimony and records establish if Plaintiff's medical condition was exacerbated or made worse by the subject accident.

Dr. John Rainey began treating Plaintiff in 2009 and testified at the initial treatment, Plaintiff complained of back, left neck and left shoulder pain. He stated Plaintiff was a diabetic and had weakness in her legs which caused them to give out on occasions. He noted Plaintiff used a cane during that time to assist her in getting around.

Dr. Rainey testified Plaintiff suffered a fall in April of 2011 and in August of 2011 complained of worsening pain in her back. Dr. Rainey felt that Plaintiff's

symptoms were consistent with someone suffering from spinal stenosis and nerve disc impingement. He ordered Plaintiff to undergo a lumbar MRI.

On May 30, 2012, Plaintiff sought treatment from Dr. Rainey following an automobile accident that occurred on May 22, 2012. Following that accident, she complained of increasing back pain to Dr. Rainey, who recommended she see Dr. George Williams, an orthopedic surgeon, for a "potentially higher level of care." Dr. Rainey stated in his notes from September 13, 2012, that Dr. Williams was looking to obtain a cervical and thoracic MRI. Dr. Rainey did not treat Plaintiff again until after the subject accident.

Two days following the subject accident, Dr. Rainey saw Plaintiff, who complained of shoulder pain and lower back pain, with pain radiating into her right leg. Dr. Rainey sent her to physical therapy, but Plaintiff reported that did little to alleviate her pain. Plaintiff continued to complain of neck and back pain in the months following the subject accident. Dr. Rainey again referred her to Dr. Williams for evaluation.

Dr. Stephen Wyble, a pain management physician who treated Plaintiff both before and after the subject accident, testified via video deposition. Dr. Wyble stated he first saw Plaintiff on October 27, 2009, on referral from Dr. Williams for complaints of neck, left shoulder, left arm and lower back pain. He noted in his records that these issues were caused by a January 2009 automobile accident. He performed one cervical steroid injection on Plaintiff in connection with that accident.

Dr. Wyble did not treat Plaintiff again until July 30, 2014, once more on a referral from Dr. Williams for possible neck and back steroid injections. Plaintiff reported to Dr. Wyble her problems stemmed from the subject accident. Dr. Wyble performed two cervical and two lumbar steroid injections, which Plaintiff

related brought her only limited relief.  Dr. Wyble then began treating Plaintiff for general pain management and outlined a future pain management plan.

Dr. Wyble also ordered an EMG in response to a recommendation by Dr. Neil Romero.  The EMG did not reveal any cervical defects and Dr. Wyble felt it looked "good - - pretty normal."  He also testified he would defer any opinion as to the necessity of surgery to an orthopedic surgeon, such as Dr. Romero or Dr. Williams.

Dr. Wyble stated, as regarding Plaintiff's neck pain, that "based on the information I obtained from her, it would be related to the motor vehicle accident [of April 23, 2013]."  As to the back pain, after noting Plaintiff had pre-existing issues with her lower back, he opined these issues were exacerbated as a result of the subject accident.

On cross-examination, Dr. Wyble stated he was unaware that Dr. Rainey had been prescribing Plaintiff pain medications in the months prior to the subject accident.  He stated that in his view this would deem Plaintiff a chronic pain management patient.  Despite this, Dr. Wyble specifically testified that Plaintiff's medical condition was "without a doubt, made worse" from the subject accident.

Dr. George Williams, an orthopedic surgeon, first treated Plaintiff in August of 2009 relating to complaints she had from an automobile accident she was involved in on January 4, 2009.  He treated her for complaints of neck pain radiating into her left upper extremity and lower back pain radiating into her left lower extremity.  He referred her to Dr. Wyble for pain management.

Dr. Williams also treated Plaintiff subsequent to another automobile accident that occurred in March of 2012.  From that accident, Plaintiff complained of neck pain radiating into her left upper extremity, thoracic pain and back pain radiating into her left lower extremity.  He noted during this time, Plaintiff was

10

using a cane to aid in walking. She was referred to physical therapy and continued conservative care.

Dr. Williams did not see Plaintiff again until April 29, 2014, at which time he reported she was complaining of similar symptoms as before, but with pain now radiating into her right extremities. He again referred her to Dr. Wyble, who performed two steroid injections each on her neck and back. When the injections provided only limited relief, Dr. Williams, in December of 2014, recommended an anterior cervical decompression fusion of Plaintiff's neck. Later, on February 3, 2016, Dr. Williams recommended lumbar spine surgery to alleviate her lower back problems.

Dr. Williams specifically noted he disagreed with Dr. Romero's opinion that Plaintiff's right shoulder and arm pain complaints were not related to the subject accident. He was of the opinion the right sided complaints, were more probably than not, related to the subject accident.

On cross-examination, Dr. Williams agreed the MRIs taken in 2009 showed disc protrusion with annular tears in Plaintiff's cervical spine and a disc protrusion in her lumbar spine. He also agreed Plaintiff was a chronic pain patient by 2012, which was prior to the subject accident. Dr. Williams acknowledged that on November 13, 2012, Plaintiff was still reporting neck and lower back pain and his records noted "for the most part nothing had changed she was still having the same issues." Dr. Williams further stated on cross-examination that on the day he first issued the recommendation for cervical surgery, Plaintiff was only reporting left sided radiating issues. Dr. Williams also stated it was possible Plaintiff would have needed surgery in the future solely based on the complaints she articulated in 2009 with regard to her neck and back.

Dr. Neil Romero, an orthopedic surgeon, performed an examination on Plaintiff at Defendants' request. He also reviewed all of Plaintiff's medical records

11

dating back to 2009. Although he stated Plaintiff related to him her symptoms were "mild' at the time of the subject accident, he found her prior treatment records revealed complaints of significant neck and back pain. Plaintiff informed Dr. Romero she had been disabled since 2012 but stated she was not sure why.

Dr. Romero's physical examination of Plaintiff revealed some pain with range of motion in her lower back. He found she exhibited limited range of motion in her neck, but intact strength and no deficit in her arms. Dr. Romero stated none of his objective testing produced any symptoms in her arms or legs.

Dr. Romero reviewed the cervical and lumbar MRIs performed on Plaintiff, both before and after the subject accident. As to her neck, he found they were consistent with moderate arthritic changes and although they did reveal some bone spurs in her neck, he found the MRIs did not show "any evidence of nerve root impingement or cord impingement." Dr. Romero found Plaintiff's lumbar MRIs were "essentially normal." Dr. Romero specifically noted the MRIs done before and after the subject accident were "essentially the same in both her neck and back."

Dr. Romero disagreed with Dr. Williams' recommendations for both the cervical and lumbar surgeries. He specifically testified he felt that neither surgery had any significant chance of improving Plaintiff's reported condition. Dr. Romero also testified it was his opinion that the risks of the surgical procedures recommended by Dr. Williams outweighed any potential benefits. Specifically, in testifying as to Dr. Williams' surgical recommendations, Dr. Romero stated:

> A. Dr. Williams at the time was recommending a three level cervical fusion. I think he since he's changed that to a four level cervical fusion. Um…I felt that cervical spine surgery for her neck would be to treat arthritic pain, more than likely that was pre-existing. I didn't see evidence of significant stenosis or nerve root impingement that would explain her upper extremity symptoms so I felt that uh… doing a four level or three level cervical fusion was essentially to treat axial neck pain from an arthritic condition which we know is unpredictable. Uh…I didn't feel that surgery had a significant chance

12

of improving her condition especially a multi-level cervical fusion which would likely leave her with a significant impairment after the surgery. I…I still feel that her MRI's appear to be normal. Uh…to recommend a lumbar fusion on someone as young as her with normal appear [sic] MRI's I just don't think has a potential to help her. Um. . .

Q. What more do you think maybe she…what should she be doing at this point with regard to her lumbar spine?

A. Well if the recommendation for a fusion is based on an annular fissure which we don't do fusions for disc protrusions with radicular leg symptoms if that does exist. We do decompressions. Uh…a lumbar fusion is…is typically indicated for spinal instability or advanced arthritic changes that cause debilitating back pain. Um…it's…it's used to stabilize an unstable spine or treat a severely arthritic spine or a severely stenotic spine. Um…I felt that if…if the recommendation for a fusion was based on discogenic or axial back pain then…then another procedure such as a discogram could've been performed to confirm that. It would've also showed the annular tear which was not present on any of the MRI scans. Um…but my recommendation was not operative treatment for her lumbar spine. I just didn't feel that the potential risk of surgery outweighed the benefits with a lack of information that we had to make a surgical recommendation.

On cross-examination, Dr. Romero did note that "[b]ased on the records that predated her accident. . ., all of her symptoms appear to be in her upper left extremity." He then noted in the emergency room after the accident in question she complained of right shoulder pain. Dr. Romero also confirmed that Dr. Williams' records indicated Plaintiff complained of pain in her right upper extremity.

Plaintiff testified as to her numerous prior health problems and prior accidents. She stated prior to January of 2009, she was treated for diabetes, high blood pressure, swelling to both legs and feet, heel spurs, bone spurs and morbid obesity. Plaintiff also confirmed she was involved in an automobile accident in January of 2009, following which she complained of pain in her neck and back, with pain radiating into her left arm and leg. These injuries, combined with her diabetes, high blood pressure and obesity, led Plaintiff to seek total disability status with the Social Security Administration (SSA).

13

Plaintiff testified she was involved in another automobile accident in May of 2012. She testified she suffered injuries in the same areas as the January 2009 accident. Plaintiff insisted her complaints of injuries were to her back, neck and left side of her body.

Plaintiff testified she began having problems with her neck, back, right shoulder and right arm immediately after the subject accident and went to the emergency room of Mercy Regional Hospital in Eunice. She then was treated for these problems by Dr. Rainey, Dr. Williams and Dr. Wyble. She testified the pain she felt in her right extremities following the subject accident was new and different than prior to the accident.

Plaintiff testified she had bariatric surgery in March of 2016 and has lost approximately 100 pounds since the procedure. She stated she no longer took medication for diabetes and high blood pressure and her goal was to lose enough weight to get cleared for neck and back surgery. She testified her goal was to relieve her pain enough to return to work.

Plaintiff testified she was currently treating with Dr. Wyble for her pain management. She said her pain was still similar to the period following the subject accident and she has "good days" and "bad days." On her "bad days" she does not leave home and has difficulty moving around.

Lastly, Plaintiff acknowledged being in two "minor" automobile accidents in 2014, wherein she maintained her vehicle sustained only very slight damage. She said the impact of each accident was very minimal.

On cross-examination, Plaintiff testified she was involved in an automobile accident in 2009, following which she treated with Dr. Rainey, Dr. Williams and Dr. Wyble for problems with her neck and back. She stated due to these injuries, she was no longer able to continue working at a corrections facility and sought

disability benefits. She eventually sought a declaration of permanent disability through the SSA.

She testified she informed the SSA she could not sleep, had depression, could not perform household chores and could not drive her vehicle. She specifically stated she could only walk approximately ten steps before needing to rest. Plaintiff testified these assertions she made to the SSA only reflected her "bad days."

Plaintiff also explained she received a medical evaluation from Dr. Scott Chapman in connection with her 2009 application for total disability. Plaintiff confirmed Dr. Chapman diagnosed three herniated discs in her cervical spine and one herniated disc in her lumbar spine. Plaintiff also confirmed Dr. Chapman's report showed she was taking fifteen separate medications, although she stated she was not taking one of the medications listed.

Plaintiff also confirmed she did complain to Dr. Rainey about pain radiating into her right leg prior to the subject accident. She acknowledged she received an injection of Toradol for the pain in her right leg from Dr. Rainey.

A review of the medical records and testimony from her treating physicians establish without question that Plaintiff suffered from numerous pre-existing conditions prior to the subject accident, including, but not limited to, diabetes, high blood pressure and morbid obesity. The record also reveals Plaintiff was involved in several other automobile accidents which contributed to problems with her neck and back.

The record clearly establishes that with her history of prior injuries and conditions, Plaintiff was in poor physical health at the time of the subject accident. In fact, she had been declared disabled years prior to the subject accident and had been deemed a chronic pain patient for several years. However,

15

[t]he defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant. It is clear that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct.

*Bienemann v. State Farm Mut. Auto. Ins. Co.*, 08-1045, p. 4 (La.App. 3 Cir. 2/4/09), 3 So.3d 621, 623 (quoting *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993)). Nevertheless, before recovery can be granted for aggravation of a pre-existing condition, a causative link between the accident and the victim's current status must also be established. *Lasha*, 625 So.2d 1002; *Edwards v. LCR-M Corp., Inc.*, 41,125 (La.App. 2 Cir. 7/12/06), 936 So.2d 233.

We find the testimony of the physicians in this case establishes, more probably than not, that Plaintiff's pre-existing maladies were exacerbated by the subject accident. Dr. Rainey testified the subject accident exacerbated her problems, although he acknowledged on Plaintiff's first visit with him in 2009 she had already been declared disabled because of chronic back pain. When asked on cross-examination whether he believed the subject accident caused the problems she is dealing with currently, Dr. Rainey responded, "I believe, that's a part of it, yes sir."

Likewise, Dr. Wyble was adamant that the injuries incurred by Plaintiff in the subject accident exacerbated her pre-existing problems. In attempting to answer a question asking him to quantify the degree to which Plaintiff's current condition could be related to the subject accident, Dr. Wyble stated:

A. See, you - - you take a patient who's already beat up, and you put her in another car wreck, and she's more beat up. And her complaints have changed. So when I saw her in 2009, she had left sided complaints. Now I don't know what happened in between. Apparently Dr. Rainey, you're telling me, was taking care of her. So I don't know what happened. All I know is when she came to me she stated that - - I knew she had pre-existing problems, but that she was doing okay. And clearly now she was doing worse. It does appear that she was on medications before. And she is probably going to

16

need them lifelong. I think she was, without a doubt, made worse from this accident. Clearly had a chronic pain condition before.

Q. So you're not able to say which - - what percentage of this amount would be the result of an April 2013 accident, are you?

A. It was broke. You broke it more. And you bring it to me, and all I can do is tell you what it needs.

Clearly, while Dr. Wyble was reluctant to put a percentage on how much of Plaintiff's current condition was related to the subject accident, he was adamant that "she was, without a doubt, made worse from this accident."

Dr. Williams was also unequivocal in his belief that Plaintiff's physical condition was made worse by the subject accident. He specifically related her right sided complaints of pain to the injuries she endured from the subject accident.

While Dr. Romero's conclusions and testimony indicated his belief that Plaintiff did not suffer any new injuries as a result of the subject accident, and, in his opinion, the proposed surgeries by Dr. Williams were not in Plaintiff's best interest, he did not specifically testify that Plaintiff's problems were not exacerbated by the subject accident.

We also note, in closing arguments, counsel for Defendant made the following statement to the jury:

> But I do admit the night of the accident she went there (the hospital), she clearly, probably had an aggravation from the inj . . . the accident that occurred earlier in the day and she and she had the medical records that she incurred these expenses. . . . She incurred these medical expenses subsequent to our accident and I suggest that on the first line under past medical expenses you give her the $40,0000 that we stipulated to, that she incurred since April 23rd of 2013.

Defendants argue in brief that this statement was only to stipulate to the amount of medical costs incurred since the accident, in an attempt to "expedite matters at trial." They assert there "was never any stipulation that the stipulated medical costs were incurred as a result of injuries caused by the subject accident." While we agree with Defendant that arguments of counsel in closing statements are not

evidence, we do find a clear reading of counsel's statement to the jury indicates its acknowledgment that Plaintiff suffered "an aggravation" from the injuries incurred in the subject accident. While we cannot say the jury erred in determining there were no new injuries suffered by Plaintiff in the subject accident, the above referenced statement by counsel for Defendants, coupled with the uncontroverted medical testimony that the subject accident aggravated Plaintiff's pre-existing problems, convinces us the jury manifestly erred in concluding Plaintiff suffered no injuries. Therefore, we reverse that finding of the jury.

### III. *Quantum.*

We next address the appropriate amount of damages due to Plaintiff. Finding the record is sufficiently complete, we will conduct a *de novo* review of the record to determine the amount of damages due Plaintiff for the aggravation of her pre-existing injuries. *Landry v. Bellanger*, 02-1443 (La. 5/20/03), 851 So.2d 943.

### A. Special Damages.

Our review establishes it is not clear from the record when Plaintiff's chronic neck and back pain returned to its "pre-accident state." This is particularly so as Plaintiff clearly has suffered from serious and ongoing pre-existing problems. However, the visit to the emergency room on the date of the subject accident as well as the subsequent visits to Dr. Rainey, Dr. Wyble and Dr. Williams, which were all "stipulated" to by Defendant, seem sufficiently related to the subject accident to be deemed compensable. The medical documents from these visits note Plaintiff's involvement and the subsequent aggravation of her pre-existing injuries from the subject accident. Accordingly, we find the jury erred in failing to award past medical expenses in the stipulated amount of $40,167.30, and so render same to Plaintiff.

Plaintiff also requests, as she did to the jury, that we award her the amount of the two surgical procedures recommended by Dr. Williams. The first was an anterior cervical discectomy and fusion, with an estimated cost of $139,302.00. The second surgical procedure was a lumbar transforaminal interbody fusion, with an estimated cost of $148,553.00. Plaintiff argued in brief there was no testimony that she would have had to potentially undergo surgical treatments to her cervical and lumbar spine "as a result of any prior conditions or accidents." However, Dr. Williams acknowledged on cross-examination that it was possible Plaintiff would have needed surgery in the future solely based on the complaints she articulated in 2009 with regard to her neck and back. Moreover, the jury was informed Dr. Chapman, who evaluated Plaintiff in 2009 in connection with her application for total disability, opined that it could be necessary for Plaintiff to undergo surgery to halt the progression of her motor and sensory deficits. The jury also heard testimony from Dr. Romero that neither surgical procedure recommended by Dr. Williams had any significant chance of improving Plaintiff's reported condition. Dr. Romero also testified it was his opinion that the risks of the surgical procedures recommended by Dr. Williams outweighed any potential benefits. Thus, we cannot say the evidence at trial established the necessity of the recommended surgical procedures, and we decline to award the projected costs of these procedures to Plaintiff.

Plaintiff also requested the jury award her future medical costs for a pain management regimen recommended by Dr. Wyble, which he maintained Plaintiff would require for the remainder of her life. The costs associated with this program, which was to be for 396 months, was estimated by Plaintiff to be $177,431.63. For the following reasons, we find the record does not support this award.

The pain management program Dr. Wyble proposed is essentially the same regimen Plaintiff has been following since 2009. As set forth earlier, in Dr. Chapman's report of 2009 it indicated Plaintiff was taking fifteen separate medications. The records also established Plaintiff continuously was taking prescription pain medications in the years prior to the subject accident, and she had numerous pain medication prescriptions filled in the months just prior to the subject accident. The medical testimony was also clear that Plaintiff was classified as a chronic pain patient years prior to the occurrence of the subject accident. Therefore, we decline to award medical costs for the pain management regimen recommended by Dr. Wyble.

**B. General Damages.**

We next turn to the issue of general damages. Finding the record established Plaintiff suffered an aggravation of her pre-existing neck and back problems as a result of the subject accident, we find an award of general damages is appropriate in this case. "The primary objective of general damages is to restore the party in as near a fashion as possible to the state he or she was in at the time immediately preceding injury." *Daigle v. U.S. Fidelity and Guar. Ins. Co.*, 94-0304, p. 7 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 437.

Based on the record before us, we find a general damages award of $100,000.00 would justly compensate Plaintiff for the injuries sustained. See *Pannell v. Encompass Ins. Co.*, 06-1601 (La.App. 3 Cir. 5/2/07), 956 So.2d 152 (this court awarded $90,000.00 in general damages for injuries to a motorist's neck and shoulder with an aggravation of a pre-existing lower back condition where the motorist had one, possibly two herniated discs); *Dugas v. Derouen*, 01-1397 (La.App. 3 Cir. 7/3/02), 824 So.2d 475, *writ denied*, 02-2131 (La. 11/15/02), 829 So.2d 426 (this court awarded general damages of $70,000.00 for an aggravation of a pre-existing disc condition and TMJ condition, broken rib and cervical strain);

20

*Guidry v. Millers Cas. Ins. Co.*, 01-01 (La.App. 1 Cir. 6/21/02), 822 So.2d 675 ($50,000.00 awarded by the appellate court for an aggravation of a degenerative lumbar condition not requiring surgery, but, resulting in continuing lifetime symptoms); and *Rabalais v. Mason*, 01-925 (La.App. 5 Cir. 1/15/02), 807 So.2d 983 (the appellate court increased a general damage award to $50,000.00 for a plaintiff who suffered an aggravation of a pre-existing degenerative arthritic condition in an automobile accident).

## DECREE

For the foregoing reasons, the portion of the jury's verdict finding each party fifty percent at fault in causing the subject accident is affirmed. The portion of the jury verdict finding Plaintiff, Laura M. Anderson, suffered no injuries as a result of the accident is reversed. Judgment is rendered awarding Plaintiff $40,167.30 in past medical expenses and $100,000.00 in general damages. All costs of this appeal are assessed equally between the parties.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**